We'll begin by calling case number 25-10297, Winder v. United States. Mr. Katara, we'll hear from you. May it please the court. I'm Steve Katara. I represent the appellant plaintiffs, the widow, children, and mother-in-law of Steve Winder. This novel FTCA case arises from the tragic death of Mr. Winder, a civilian, after an Army chaplain negligently coerced his service member wife, Latricia, into calling law enforcement during Steve's suicide crisis. Law enforcement went to Steve's rural Texas home, and a 23-year-old rookie sheriff's deputy opened his door without a warrant, confronted him, and shot and killed him. Our FTCA claim is that the Army chaplain, who was trained in secular suicide intervention and prevention, and also bound by confidential, excuse me, by secular confidentiality rules, undertook to provide secular advice to Latricia about how to handle Steve's suicide crisis and threat, and that he gave that advice negligently. The FTCA provides a remedy for that negligence. The district court erred in dismissing the case on ecclesiastical abstention grounds and the Ferris Doctrine. Neither bars this suit, and the court should correct those errors. I plan to first discuss the ecclesiastical abstention or church autonomy doctrine, and it does not apply because our claim arises from the chaplain's secular advice and secular suicide intervention conduct, which is governed by secular Army regulations. Next, I'll address Ferris, and it does not apply because the only cognizable injury in this case is the shooting death of Steve, who was not a service member. His wife, a service member, was not injured. Last, if time permits, I'll address that our complaint pleads adequate Texas state law corollaries for negligence and plausibly states negligence claims. Our negligence claim is that the chaplain, Captain Johnson Glassel, was acting as a government employee trained in suicide prevention and intervention when he gave negligent advice that caused a foreseeable fatal outcome. This is not a claim for clergy malpractice. We are not complaining about religious advice. This is a civil dispute that happens to involve a religious official. Army chaplains are trained in secular suicide prevention, and they're bound by secular confidentiality rules, not religious rules. And our claim is that the chaplain negligently directed and coerced Latricia to call law enforcement despite the foreseeable risk to her husband. The ecclesiastical abstention doctrine is not implicated in this case. The issue is not the chaplain's religious advice. It is that he negligently coerced a specific secular action, calling law enforcement for a welfare check despite the objection of Latricia and her mother-in-law, who FaceTimed with the chaplain and Latricia. Latricia and the chaplain were in Virginia, and they FaceTimed, and both Latricia didn't think it was a good idea, and the mother-in-law, who lived next door to Steve, said it would not bode well. Unfortunately, she was correct. This court in 2020 in McRaney said that the ecclesiastical abstention doctrine precludes judicial review of claims that are strictly and purely ecclesiastical. This case does not involve that. This case involves purely secular conduct. Military chaplains, of course, perform religious duties, but they are also federal employees tasked with secular responsibilities, including suicide prevention and intervention. Suppose we adjust the facts a bit, and the husband is dying of a medical condition, and the wife is consulting the chaplain over some sort of proposed heroic medical treatment, and as a result of the counseling, they decide to decline, just to trust God to decide whether it's time for the husband to come home or not. Is that a different result in your mind, or would the ecclesiastical abstention doctrine also not apply there? I believe that's a different result, and a hypothetical I was going to raise with the court was, for example, a chaplain could have said, I'm a religious person, and I believe in the power of prayer. Let's just pray that everything will be okay with your husband. And then maybe he did go ahead and commit suicide. I believe that that would be religious advice that would be protected. In this instance, the chaplain, he wore two caps, a chaplain cap and a secular suicide intervention. Who decides which cap is on at a given moment with regard to a given statement? The facts of the case. Why can't he be wearing both hats at the same time? In fact, let's just stipulate that there's a situation where the advice given is, in fact, everybody agrees, it's both religious and secular. What would you do in that situation? Well, if the court could not parse the advice, and in this case it can, if the court cannot parse it, it's probably protected. Should we be nervous, though, that any litigants asking us to parse and decide, okay, this is religious, that's secular? Why shouldn't that make us terribly nervous? Well, I believe, Judge Ho, that courts parse things all the time. For example, whether a certain speech is protected or unprotected under the First Amendment. Courts admit evidence for limited purposes, and judges and juries have to step in when it's appropriate and within the authority of a civil authority to opine. But the whole point of church autonomy doctrine is that there are issues on which civil authorities absolutely should not opine. Why isn't this one of those? Because the advice, the conduct at issue was purely secular. I understand you're saying that, and I get your argument, but that's an argument, right? I'm assuming that somebody is going to stand up in a few minutes and argue that it was most certainly not secular. The very fact of deciding that question strikes me as potentially interfering with religion. And I don't believe that my friends on the other side will be able to articulate how what the chaplain did in this case was religious and not secular. Suicide intervention in this circumstance with a guy with a gun to his head halfway across the country, he did not give religious advice to the wife. Instead, he coerced her into calling law enforcement. Suppose the wife says, I don't think I should do anything. I'm just going to trust God because I think God wants me to just leave this alone. And the pastor or the chaplain says, well, God wants you to be involved, to take care of your husband. I'm not obviously weighing in on that. In fact, my whole point is it makes me terrible nervous to decide who's right and who's motivated by religion and who's not. Well, I think we only look at the government employee's conduct, in this case the chaplain. We don't look at the wife's. And I think that the court has to focus only on that conduct and not on other factors. I'm presupposing that the chaplain is going to resist the notion that this was secular and not religious. What gives us the right to say, no, Mr. Chaplain, you're actually being secular and not religious? Tell me why that's not a controversial and, frankly, disturbing exercise of judicial power. Well, I believe that courts always have to make tough calls, and often they're based on the facts of the case. And if the facts were different, if the chaplain had given religious advice, I don't think we would be here today. I think that we would only be, we would not, the claim would, the doctrine would probably apply in that case. Are there confidentiality regulations that state that a communication is confidential if it's made to the chaplain in his capacity as a spiritual advisor? Yes, Judge Douglas, thank you for asking that question, because it's important. Because Latricia asked to see a chaplain for two reasons. Number one, her husband had incorrectly accused her of infidelity, and he also made suicide threats. And she saw the chaplain for those two reasons. And we admit in our pleading that she sought spiritual comfort for the infidelity accusation. That's something that people go to ministers and priests and chaplains for. But she also had the suicide threat. And in the military, in the Army, chaplains are trained in suicide intervention and prevention. They are required to understand it. And in this case, we allege that the chaplain botched that part of his meeting with Latricia. And he coerced her. He negligently coerced her into calling law enforcement when she didn't want to. And we allege that that was not reasonable and prudent secular conduct. How did he coerce her? He told her that if she did not call law enforcement for a welfare check, he would, and she relented. That is what we plead. And that was in violation of the confidentiality that enveloped this whole meeting with the chaplain. By what authority did he speak? Excuse me, Your Honor? By what authority did he speak? He spoke on the issue of the suicide threat. He spoke as a government employee who was tasked with assisting service members and their families in suicide intervention and prevention. And he did that negligently. As an employee, who is his employer? The United States. He was in the Army. I understand. In the Federal Tort Claims Act. Why is it the simple answer? He spoke on the authority given to him as a military member. That's why he was there? That's what he was doing? And I agree with you, Your Honor. That is, he was a member of the military. And as such, he was an employee of the federal government. And he was acting in that role regarding suicide intervention as a secular representative or counselor giving advice to a service member who asked for advice. And he did it negligently. He selected, he had many options. I believe that chaplains are not the only folks in the Army who are trained to deal with suicide. Do you think that's right? I am not sure of that, Judge Douglas. I have looked for everything I could find on the Internet on suicide prevention and intervention. I believe there were other people who were trained and she decided, she made the choice to go to a chaplain as opposed to a psychologist or somebody else who might be trained in that type of intervention. Was she making a decision to seek a spiritual advisor? She asked, our pleadings state, and it's she asked to see a chaplain because she had two issues. Her husband had accused her incorrectly of infidelity, and he was making suicide threats. And she went to, I believe, the obvious person, a chaplain, and I don't know all the ins and outs of it, but I believe that because the Army regulations provide for chaplains to be trained and to understand suicide intervention and prevention principles, that she picked the right person to go to. But then the chaplain picked the wrong thing to do, and it caused a death. He had other options he could have considered, and he picked the worst. He injected law enforcement into a volatile situation in rural Texas with an armed man who was mentally unstable, and it was foreseeable that this would happen. It was a recipe for a bad outcome. And I see that my time is almost up, and I will rely on my brief for the other issues, including the Ferris Doctrine's inapplicability because a service member was not injured. Thank you. Thank you. You've saved five minutes for rebuttal. Yes, Your Honor. Ms. Hyatt. May it please the Court. My name is Andrea Hyatt. I'm an assistant United States attorney from the U.S. Attorney's Office for the Northern District of Texas. I'm honored to represent the appellee, the United States of America. If I may, Your Honor, I'd like to begin by addressing a few questions that came up earlier. The Court asked by what authority this chaplain spoke. I would point out that the chaplain was not speaking as a representative of the military, but as a representative of his religious organization, and that's because of the unique setting in which an Army chaplain operates. He must, he or she must be sponsored by a religious organization. So if he, for example, is a Mormon chaplain, he would be sponsored by the Church of Jesus Christ of Latter-day Saints. And the Army regulations state that when he is ministering to individuals in the Army, he is required to act as a representative of that religious faith organization. So when he's giving advice to, spiritual advice to Specialist Winder, he is acting in his capacity as a spiritual advisor. The Court also asked a question about whether— Let me stop you there. Yes, Your Honor. So I take it the core allegation by the plaintiff is that the chaplain behaved coercively by saying, if you don't report this to the police, I will. Yes, Your Honor. Can you talk to me about whether or how that was motivated by faith rather than by something outside of his faith? By the context of the facts and circumstances in which the religious counseling session occurred. So, for example, the Army specialist asked to speak to a religious advisor. By Army regulations, he came to her to provide her with spiritual guidance and counseling. So when he is doing that, he's acting as a representative of his faith. And when he gives that advice, he can choose, as the plaintiff explained, one religious counselor may choose to get down on his knees and pray with the plaintiff. Another one may feel compelled when serving as a religious advisor of his faith that the appropriate course is to reach out to authorities to help take a more practical approach. As this Court correctly identified, it's problematic and entangling for a court to decide which of those approaches is, quote-unquote, secular and which one is, quote-unquote, spiritual. By that very enterprise, the Court— The argument, though, that calling a—you know, everybody agrees, opposing counsel concedes, that if the response was prayer or consulting the Bible, that that would be protected by church autonomy. The argument here is calling a secular authority. That was the chaplain's call. The chaplain's invoking a secular authority, and they're arguing, and a skeptic would say, that has nothing to do with religion. What is the United States' response? Yes, Your Honor. Well, even if it were facially secular, it's intertwined with his religious doctrine. That is what he felt was the appropriate advice to give as a spiritual advisor. If the judiciary were to get involved and say, no, no, no, that's secular counsel, that would be determining what conduct and beliefs are part of a particular religion. So as part of his religion, he felt that the appropriate course was to advise this specialist to contact local law enforcement, as opposed to, let's say, to pray and take a non-interventionist approach. For a secular court to decide that this one is protected, this approach is protected by religion, and this one is not, is inherently problematic. I suppose the counterargument is that the chaplain is making it secular by invoking a secular authority. I'm just trying to understand why we shouldn't assume that. I don't think the Court should assume that, Your Honor. Why not? Many times when a congregant comes to a priest or other religious advisor, he or she is asking for advice on a secular problem, but the reason they're asking a priest or other religious advisor is because they want that advice through the lens of a spiritual advisor. So, for instance, let's say if I wanted... If the chaplain had said, you know what, I don't have anything for you from a spiritual matter, but if I were you, I would call the police and just handle this purely through non-religious channels. Yes. What if the chaplain had said that? I'm not saying that happened here. If that had happened, Your Honor, and it is absolutely not what happened, Your Honor, but if he had said, look, I'm not equipped as a spiritual advisor to assist you, there's nothing religious about this, you need to go talk to a licensed suicide prevention specialist, that would not be protected because then we are outside religious counseling and we would not need to adjudicate matters of faith, scripture, or religious doctrine, Your Honor. I don't know if I answered Judge Douglas' question about whether chaplains are the only spiritual advisors, are the only advisors available. You did not. Thank you, Your Honor. So the answer to your question is no. The Army provides licensed clinical providers in addition to Army chaplains. Are they also trained in suicide prevention and intervention? Yes, Your Honor, and that is part of a document that the plaintiffs rely on. It's an Army pamphlet called Health Promotion, Risk Reduction, and Suicide Prevention. The plaintiffs quote it and the district court quotes it on page 202 of the record. And it points out that there are multiple individuals involved in suicide prevention in the Army, and the role of the Army chaplain is to provide spiritual advice. And it states that in three different places, as the district court recognized. First, it states that chaplains provide ministry to soldiers and family members to maintain spiritual health. It also states that the chaplain's role in suicide prevention is to advise commanders on moral and ethical issues. And then a third place. Is that a moral or ethical issue? Yes, Your Honor, I believe it is. Because it's given by a spiritual advisor in the context of a religious counseling session as spiritual advice about how to. . . What you just read to me seems to cabinet on ethical and moral issues. It didn't just say outright that any advice given to a service member falls within the realm of spiritual advice. It cabineted. It said specifically related to ethical and moral issues. Yes, you're right. You're correct, Your Honor. There's two other places where it does use the word spiritual. There's a place where it says they're to provide spiritual help. And the other place, it doesn't say spiritual, but it says their role is to provide religious support designed to prevent suicide in the military. What would you say to advice by a judge advocate to a military member? And he advises him, his client, not to take the stand. And can he be sued for malpractice? I don't know. Am I remembering right, Your Honor, that you served as a judge advocate? I'm reaching for people who are military officers who are charged with responsibilities that also draw upon the external commands of the law. And the JAG officer is a classic example of that. They're advising military members about the civilian law as well as the military principles themselves. How does the Ferris Doctrine fit into that mode? So the Ferris Doctrine would apply, Your Honor, whenever you have a situation where a military service member or a family member is seeking to recover in a dispute where there is an injury to the service member that arises out of their service in the military. So in the situation you're describing, Your Honor, would that apply to bar a legal malpractice claim against a judge advocate? I haven't looked at that issue, Your Honor, but I believe it would, Your Honor. You believe it would? I believe it would, Your Honor. Bar it? Bar it, yes, Your Honor. Most of the Ferris Doctrine cases deal with personal physical injuries as opposed to an injury from a breach of a duty. Take a hypothetical of a JAG officer. A young pilot comes in, a West Point graduate, and he says to him that I have a fear of flight. Those are magic words. You say those words, you're grounded. And there's no cooperation at all. And then the advice to him is, because he says, look, when I land, I could pour the sweat out of my boot. Now, that happens to be a fact pattern. Now, how do you, the Ferris Doctrine, play into this if this JAG officer told him that he should just keep his mouth shut? And if he ever utters to a commanding officer those words, he's grounded. Now, how do you, I'm thinking of the complexity of the Ferris Doctrine where you have the military member who is really there because of his own distinct profession, the lawyers, they are ministers. Yes, Your Honor, I haven't seen it in the context of a legal professional, but it does come up often in a context of medical professionals who themselves have a duty, a standard of care to meet, and the courts consistently apply it, for example, to doctors who are in the military treating folks at a military hospital. A JAG officer is giving legal advice to military members about taxes. You name it. The chaplains also, they're there because of their distinct training and whatever, and then they're engaged in the military, but then they fit them into the military disciplinary process, and that doesn't strike me as being, I don't see a neat, clean categorization metric for that. It may fall under the third rule that a court uses to apply the Ferris Doctrine, Your Honor, and that's when a military member is taking advantage of a benefit that is offered by the military. So in this situation, you describe the military member would be affording itself a benefit of legal advice that's available to them by virtue of their membership in the military, just like a person, a service member who gets treated at a military hospital tent is availing themselves of, you know, medical care, and in this case, a military service member availing themselves of spiritual guidance available to them by virtue of their service in the military. If I heard the appellant correctly, I think the argument, he didn't focus much on Ferris, but I think the argument was that no service member was injured. How do you respond to that? Your Honor, I would say that that's wrong on the facts and it's wrong on the law. It's wrong on the facts because the complaint does allege an injury to a service member. There are two places where the complaint alleges that the service member, Latricia Winder, was injured. First, it states that she had an injury to her personhood, and then there's another spot where it says that the chaplain misused his chaplaincy power in a way that violated her personhood. But ignore those, Your Honor, and if we strip those out of the complaint and looked at just what does the law say about the requirement of an injury to the service member? It's not required. There are cases where even though the service member was not injured, if the injury to the family member resulted from treatment to the service member, it's also Ferris barred. There's a good case where a military service member received a rubella vaccination that did not injure her, but it injured her child. The child later brought a lawsuit against the Army, and the court held that it was Ferris barred. The same rationale applies in either case, Your Honor. The idea is that you want to respect the military's ability to respond to crises. In this case, a rubella outbreak, and that allowing that lawsuit to proceed would basically have courts second-guessing military commanders' decision about how to respond to an outbreak of rubella in the Army. So I don't think that that argument is valid either on the facts or the law, Your Honor. I think the focus here is upon the scope of the waiver itself. The FTCA typically does not waive claims, so I think that's the beginning point and ultimately the ending point. Yes, Your Honor. You're absolutely right. The FTCA is a waiver of sovereign immunity with exceptions, including the Ferris Doctrine. Thank you. Thank you, Your Honor. Mr. O'Brien. Good morning, Your Honors. Michael O'Brien for the Meeke Chaplaincy Groups. May it please the Court. What we've heard from my friends today confirms that this conceitedly novel case is a heartland church autonomy case. I'd like to make two points. First, plaintiffs invoke a religious standard of care and religious confidentiality standards, as Judge Douglas pointed out, for adjudicating civil negligent counseling liability. No neutral principle could ever thread that needle. Second, as Judge Ho indicated, any attempt to parse out superficially secular bits and pieces of religious counseling would be impermissibly entangling. To begin, it's important not to lose sight of what's been true of 250 years of chaplaincy history, federal law, and the Army's own regulations. Chaplain counseling is religious counseling. Congress and the military recognize that the Free Exercise Clause requires the provision of chaplains to soldiers removed from their home religious communities, as the Second Circuit explained in Katkoff. But the Army can't tell someone how to be a good rabbi or how to correctly administer sacraments, so it relies on distinctive faith groups to endorse and supply qualified members of their own clergy to serve as chaplains. As Army Regulation 165-1, cited repeatedly in the complaint, including at ROA 11-12, explains, chaplains' primary duties all involve religious support, and commanders cannot assign extra responsibilities unrelated to those primary religious duties. And pastoral counseling is one essential part of those religious duties. Okay, but here we're talking about the chaplain invoking a secular authority. Can you give me an example or an argument as to why or a case that supports the notion that that can nevertheless be religiously motivated, the invocation of a secular authority? So, yeah, Your Honor, I think it is alleged in the complaint that this advice, that the police referring to the secular authority, was still given in a spiritual capacity. And I think you can always frame religious advice, you know, for instance, advice concerning communion or keeping kosher halal as nutritional advice, and that's what the Ninth Circuit rejected in Markle, delineating secular from religious communications. As this court in Whole Woman's Health explained, courts lack the institutional competence to delineate supposedly secular facts out of religious communications. And I think... That doesn't invoke the help of a secular authority. I think a case that is helpful as well, then, Your Honor, is the Texas Supreme Court's decision in Westbrook, which is even further removed from the core religious facts at issue in this case. There, the court assumed that the pastor's counseling was on secular subject matter, but it still couldn't proceed under the church autonomy doctrine to resolve the plaintiff's negligence claim, because that counseling was... It couldn't parse out the pastor's religious role from, there, a licensed professional marriage counselor's supposedly secular advice. And here, the complaint bakes in into the standard of care, a well-trained army chaplain standard that's at ROA 32 to 33. Also, even plaintiff's reasonable alternative doubles down on religion, suggesting that the chaplain should have called a local pastor to speak with Steve. That's at ROA 34. The standard of care is key and dispositive here. Evaluating whether an army chaplain acted reasonably necessarily requires judging whether he followed a standard of care that's defined by his endorsing religious group. And chaplains must provide pastoral counseling as faithful representatives of their endorsers. Otherwise, they're subject to immediate removal of their endorsement and termination from the military. That's why this court in Sanders said that it would violate church autonomy to embroil courts in a standard of care that requires them to identify and apply the teachings of a particular faith. Plaintiff's invocation of the covenant and code of ethics for chaplains proves the point. That is a code of spiritual ethics, as the complaint acknowledges, and it begins, quote, having accepted God's call to minister, I covenant to serve God. It's a pledge to minister under the practices of the chaplain's religious body and in adherence to the direction of the endorsing body. And those confidentiality duties, as Judge Douglas pointed out, only obtain in the first place if the chaplain was acting in his capacity as a spiritual advisor. And plaintiffs conceded below at ROA 144 and here in their brief at page 44 that application of this covenant does present a religious, quote, evidentiary component. They wrongly say that's the only one, but it's still too many for the church autonomy doctrine. You mentioned Westbrook. What's the invocation of secular authority in Westbrook? In Westbrook, Your Honor, there was no call to the police, but I think the— That's what Judge Douglas was asking, though. Okay. I don't know. This, again, is a novel case, Your Honor. I don't know of a case where a counselor called the police to protect life, but there is no allegation in the complaint that the chaplain's actions were somehow inconsistent or at odds with the tenets and requirements of his endorsing faith group. It may not be inconsistent, but isn't the question, or tell me if this is the wrong question, whether the invoking of secular authority sprang from the religious nature of the counseling? Under the regulations and chaplaincy practice, it has to. The advice has to flow from the chaplain's—the tenets and religious requirements of the chaplain's endorsing faith group. Chaplains provide religious advice. They're not—they don't spout off on, you know, supposedly secular recommendations. I see my time's up, Your Honor. Thank you. Thank you. Mr. Katara, you've reserved five minutes.  Judge Higginbotham, you raised the prospect of legal malpractice and of a military lawyer giving bad advice, and one of the cases I cite in my briefs is the Mossau v. United States case. It's an Eighth Circuit case where the court held, and this was a Ferris case, that a legal malpractice claim was not barred by Ferris. That case involved a service member. They were Air Force parents. The child was born with cerebral palsy. The father sought legal advice from the base attorney who told him that they could not sue to recover damages for the child's injuries. By the time the lawsuit was actually brought, the child's FTCA claim was barred by the statute of limitations, so the child alleged legal malpractice, and the parents were not seeking damages. The court held that the child's claims were not barred by Ferris because it was brought by a civilian dependent of service members who had sustained injury. The parents had not sustained injury. So, and I'll also add — Is that different from this case since you say, is it Winder or Winder? Winder. That Mrs. Winder suffered a damage to her personhood? Injuries to her personhood? We refer to that because that is in the chaplain's code of conduct. We are not suing for an injury to her personhood. She is a wrongful death beneficiary suing for wrongful death damages only. She did not, that this metaphysical injury to her personhood is not a legally cognizable injury that we're suing for. And she was not injured. The injury was the shooting death of Steve Winder and his children and his wife and his mother-in-law, who was standing next to him, were shot. She has a bystander recovery. Those were the injuries. And in the Romero case, which was a Fourth Circuit case, again it involved a birth injury, there the court held that the active duty service persons could recover consequential damages for their non-physical injury they sustained as a result of the injury to a civilian. And that's what Latricia is suing for. She's suing for her non-physical wrongful death damages under Texas law. And then back to the church autonomy doctrine. The confidentiality regulations that are at play here, they are all secular. It's an Army regulation. The military rules of evidence provide for confidentiality and the chaplain code of conduct. Those are not religious tenets that the chaplain is bound by. These are secular rules of confidentiality. And, again, this is a civil dispute that just happens to involve a religious official. There is a standard of care, we believe. Isn't it a religious question when to place one's faith in God and when it's permissible to comply with secular authority? Isn't that itself a religious question? Matthew 22, rendering to Caesar what Caesar's and God what God's. That itself is a religious question, isn't it? I believe it can be characterized as that. But in this case where the Army requires chaplains to be trained in suicide intervention and prevention and to understand it, that's part of their job. That's a job responsibility of a government employee. And that's why I talk about wearing two hats. There's the chaplain hat and then there's the government employee hat, where the chaplain is giving secular advice on what to do with this life-or-death circumstance of a man with a gun to his head halfway across the country. And we allege that he violated the standard of care in that circumstance. And that's why this case should proceed. And we ask the court to vacate and remand. Thank you. Thank you, Your Honor.